IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 10, 2003 Session

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. R. S. AND K. S.

Appeal from the Circuit Court for Franklin County
No. 12,188-CV     Buddy D. Perry, Judge

No. M2002-00919-COA-R3-CV - Filed September 11, 2003

This appeal involves a petition filed by the Department of Children's Services to terminate the parental rights of Mother and Father to their three minor children. The trial court denied the petition and ordered the children returned to Mother and Father. The Department appeals the decision of the trial court, arguing first that there was clear and convincing evidence to support termination, and secondly, even if the denial is upheld, the trial court lacked jurisdiction to order the children's return to their parents. Because we find the petition was properly denied, but further find the trial court lacked jurisdiction to order the children's return home, we affirm in part, vacate in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part, Vacated in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which CAROL L. MCCOY, SP. J., joined. WILLIAM B. CAIN, J., filed a concurring opinion.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, for the appellant, State of Tennessee, Department of Children's Services.

Thomas C. Faris; Glen A. Isbell, Winchester, Tennessee, for the appellees, R. S., K. S.

### OPINION

At issue are both the trial court's denial of the petition to terminate the parental rights of Mother and Father, in regard to their three (3) minor children, M. R., born June 13, 1986, R. S. , born June 30, 1992, and S. S., born March 31, 1995, and the trial court's order returning the children to their parents.

Early in 1997, the children's older cousin, Sherry Long suspected that the middle child, R. S., had been sexually abused by his father. Although denying anything at first, R. S. later confided

to his cousin several disturbing incidents. Following her conversation with R. S., Ms. Long contacted the Department of Children Services ("DCS") with her concerns that the three children were neglected and that R. S. was being sexually abused by his father.

Following up on Ms. Long's referral, Pam Brewer with Child Protective Services ("CPS") of DCS visited the parents' home on February 11, 1997, and asked them to come to her office with the children to discuss a complaint that had been made against the family. The entire family arrived at the DCS office around 10:00 am. Upon their arrival, various family members were individually interviewed for the next ten hours.[1]

When R. S. was interviewed by Ms. Brewer, he was very quiet and would not confirm Ms. Long's allegations. However, when Ms. Brewer left R. S. alone in the room with his cousin, with the tape recorder on, Ms. Long did elicit some affirmative shrugs and responses to her leading questions.[2]

As for Mother, during her first interview by Ms. Brewer, early in the day, she denied that her husband sexually abused their son R. S. Ms. Brewer questioned Mother extensively about whether R. S. and her husband took baths together, and whether R. S. had ever complained to her about his father abusing him. Early on in this initial interview, it became obvious that Mother was by her own admission "slow."[3] Nonetheless, Mother was steadfast in her denials.

Later in the afternoon around 4:00 p.m., Officer Grubbs returned to DCS, now in her police uniform, and took the lead in questioning Mother for a second time for approximately two and half hours.[4] At the start of this interview, Officer Grubbs *Mirandized* Mother, and Mother later testified that "I was scared, and I thought I was going to jail when I did not do nothing."[5] Officer Grubbs

---

[1]In addition to Ms. Brewer, Winchester police officer Jennifer Grubbs was present for both interviews of Mother. Initially, Officer Grubbs wore plainclothes, but changed into her police uniform later for the afternoon interview session. Officer Grubbs interviewed Father separately for approximately two hours. The interview with Father was never placed into evidence. Nonetheless, we do know from reviewing Officer Grubbs' interview with Mother later in the day that the Father denied sexually abusing R. S.

[2]Ms. Brewer intentionally left the room with the tape recording on in hopes that R. S. would confirm to his cousin that the sexual abuse had occurred.

[3]Mother stated that she was on disability for being "slow." At trial, DCS workers conceded that Mother's intellectual functioning was low and that she had to have things explained very carefully. Psychological assessments and the counselor's testimony established low intellectual functioning of both parents.

[4]By this time, according to Mother, the children had not been fed and were running around in the offices and Mother had been unable to change the baby's diaper. She testified, "I was tired. They wanted to go home and eat, and she still wouldn't let- -she did not let me go home until my sister come and got the children."

[5]Mother testified that her two brothers came to DCS and that she asked Officer Grubbs if they could talk to her and explain what was happening, but the Officer would not allow them to speak to her. Her brother gave consistent testimony.

kept telling Mother to tell the truth.[6]  It was at this point that the Mother changed her denials and admitted R. S. had told her his father had molested him a few days earlier.[7]  At trial, Mother testified that she had not been telling the truth when she accused her husband of sexually abusing R. S. "I told them what they wanted to hear so I could go home and feed my children and change my daughter's diaper."[8]

Following this marathon session at the DCS office, the three minor children went home with a relative and were taken into DCS custody the next day.  In either April or June, the Franklin County juvenile court adjudicated the children dependent and neglected by agreed order.[9]  Throughout the next three years, DCS and the parents entered into permanency plans with the goal of returning the children to the parents.  After a Commissioner review recommended termination, DCS's goal changed, and on September 6, 2000, DCS filed a petition in Franklin Circuit Court[10] to terminate the parental rights of the parents.[11]  DCS alleged three statutory grounds: (1) abandonment; (2) substantial noncompliance with the plan of care; and (3) persistence of conditions which prevented the return of the children to their parents' care.

On June 4, 2001, the termination hearing began.  Following a full day of testimony, the bench trial was continued until November 8, 2001, when the proof was concluded.  On January 16, 2002, the guardian *ad litem* filed his report,[12] recommending that the petition be denied since DCS had not

---

[6]Officer Grubbs told Mother that her husband was denying everything and placing the blame on her and others. Grubbs also told her that Father admitted taking baths with R. S. and that she knew Mother was lying about it.

[7]At this point, Mother admitted that Father and R. S. take baths together and that they are not always monitored by her.  She also stated that R. S. recently told her that his father had molested or attempted to molest him.

[8]Mother's sister arrived at DCS between 8:30 and 9:00 p.m. to take the children to her home for the night.  At trial, Mother recalled that her daughter had a horrible case of diaper rash from the filthy diaper.

[9]This order does not appear in the record before us.  DCS continually refers to an April, 1997, order, but the trial court found the order was entered in June of 1997.

[10]On April 12, 2001, the Mother filed a Motion to Remand the case to Franklin County Juvenile Court because: (1) Juvenile Court enjoys concurrent jurisdiction over the termination proceedings under Tenn. Code Ann. § 36-1-113(a); (2) Since Juvenile Court had granted temporary custody of the children to DCS on February 12, 1997, the Juvenile Court had entertained all related motions and pleadings for over the last three years and therefore the Juvenile Court was substantially more familiar with the parties and the nature of the case. DCS opposed the remand motion, arguing that the petition to terminate is a separate and distinct cause of action and legally unrelated to any pending proceedings of dependency and neglect. Although an order denying the remand motion is not in the technical record, we presume the trial court denied the motion given the fact that the matter proceeded to trial in Circuit Court.

[11]On November 28, 2000, the trial court appointed legal counsel to represent the parents in the termination proceeding.

[12]Greg O'Neal was appointed the minor children's guardian *ad litem* sometime prior to the resumption of the trial on November 8, 2001.

proved by clear and convincing evidence that Father had sexually abused any of his children, or that the parents had failed to comply with the parenting plan or that their visitations were "token."

On March 14, 2002, the trial court entered its order denying DCS's petition to terminate parental rights and further ordered DCS to return the children to the custody of the parents.[13] On April 11, 2002, the trial court entered detailed findings of fact and conclusions of law regarding its denial of the petition. On April 12, 2002, DCS moved the trial court to alter or amend its judgment concerning custody and visitation. DCS argued that the trial court had lost its jurisdiction when it denied the termination petition and that all custody matters had reverted to the exclusive jurisdiction of the Franklin County Juvenile Court.[14]

## I. STANDARD FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996) (quoting *Santosky*, 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

_____

[13]On March 8, 2002, Mother filed a Petition for Contempt against DCS for failure to comply with the trial court's order to implement a plan for additional visitation with the minor children. Moreover, Mother complained that DCS had repeatedly refused to allow the parents to visit the children or to sign off on a plan to return the children to the parents, as ordered by the court.

[14]According to the technical record, this motion was never ruled upon. This may be explained by DCS's filing its Notice of Appeal on the same day.

Our legislature has established those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought, Tenn. Code Ann. § 36-1-113(g), and parental rights may be terminated only in those statutorily defined circumstances. *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Because the decision to terminate parental rights affects fundamental constitutional rights, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403; *In re M.W.A.*, 980 S.W.2d at 622; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

> In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *see also Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 (Tenn. Ct. App. 2001).

Thus, it was the burden of DCS to present "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn by the evidence." *In re Valentine*, 79 S.W.3d at 539. The trial court found this burden was not met; on appeal, DCS maintains it was. In this court's review, we must determine *de novo* whether DCS has proved its case by clear and convincing evidence. *Id.* at 536. Although members of this court have differed regarding how we are to apply the standard, *see In re Z.J.S. and M.J.P.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *10 (Tenn. Ct. App. June 3, 2003) (no Tenn R. App. P. 11 application filed), we have concluded that the analysis used by our Supreme Court in *In re Valentine* governs our review. Consequently, first we will review the trial court's findings of fact *de novo* with the presumption of correctness accorded by Tenn. R. App. P. 13(d), and then determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for termination. *In re Z.J.S. and M.J.P.*, 2003 WL 21266854, at *10.

The existence of any one statutory ground will support termination of an individual's parental rights. *In re C.W.W.*, 37 S.W.3d at 473. In addition, if a court, applying the appropriate evidentiary standard, determines that one of the grounds exists, the court must also find, using the clear and convincing evidence standard, that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

## II. ALLEGATIONS, NOT FINDINGS, OF SEXUAL ABUSE

Sexual abuse, or any other form of severe child abuse,[15] is a ground for termination of parental rights where:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily permanently in the home of such parent or guardian. . . .

Tenn. Code Ann. § 36-1-113(g)(4).

In its petition to terminate the parents' parental rights, DCS alleged that when the children were removed from the home the juvenile court found that the children were victims of sexual abuse. The petition also alleged that an agreed order had been entered on April 29, 1997, finding the children dependent and neglected. The petition did not allege Tenn. Code Ann. § 36-1-113(g)(4), *i.e.*, a prior judicial finding of severe child abuse, as a ground for termination.

In her opening statement at the beginning of the trial, counsel for DCS asserted that the original petition for removal of the children from the parents' custody was based upon allegations that the middle child, R.S., had been molested by Father. Counsel stated that there had been an "adjudication to that sexual abuse order." In arguing that there was no need to re-litigate the cause of the children's removal, counsel stated that the consent decree of April 1997 included a finding of sexual abuse and that, therefore, the issue was *res judicata.* She specifically stated that DCS wanted to rely on the fact that there was an earlier adjudication that the children were sexually abused.

Similarly, at the beginning of the continuation of the trial, DCS counsel again stated that the allegations of sexual abuse had been considered severe by the prior "adjudicatory order," and stated

---

[15]Tenn. Code Ann. § 37-1-102(b)(21) defines severe child abuse, and that definition includes any act prohibited by various criminal statutes, including those against rape of a child, incest, aggravated sexual battery, and aggravated rape.

that finding was in itself a ground for termination.[16] During a discussion with counsel prior to a recess, the trial court discussed the issues and stated that DCS took the position that there had been a prior finding of abuse. Throughout the trial, DCS continued to represent to the court that there had been a prior judicial finding of severe abuse. That representation was inaccurate.

All prior proceedings involving these children had taken place in the juvenile court. This termination case was tried in the Circuit Court by choice of DCS. Therefore, the records of prior proceedings in the juvenile court were not automatically part of the record in this case. DCS did not introduce into evidence the order represented by DCS to include a finding of severe child abuse, and no such order appears in the record before us.

In its findings of fact herein, the trial court found that the consent decree or agreed order entered in the juvenile court on June 13, 1997,[17] found the children to be dependent and neglected, but that there was no finding of sexual abuse against the parents. At oral argument before this court, appellate counsel for DCS conceded that the juvenile court order did not include a finding of sexual or severe abuse.

Neither Father nor Mother was prosecuted, so there is no finding by a criminal court that any abuse occurred. Additionally, the trial court herein did not make a finding that the children, or any one of them, had been the victims of severe abuse. Consequently, DCS cannot rely on statutory provisions only applicable where such a judicial finding exists.

DCS's petition for termination also alleged that the juvenile court's finding of abuse required a "Commissioner's review" of the case prior to returning the children to the custody of the parents. That review process and outcome were the subject of much discussion and evidence at the trial. By statute, if a child is found to be dependent and neglected **as a result of abuse**,

> . . . the court shall not return the child . . . to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse until the court has received and considered reports and recommendations prepared in light of the possible return of the child by:

---

[16]This court has previously indicated that DCS cannot rely on a prior finding of severe abuse as the ground for termination where DCS has entered into permanency plan agreements with parents with the goal of returning the child to the home. While DCS may initially determine that the abuse was so severe as to justify a goal of adoption and termination of the parents' rights, if DCS chooses otherwise and leads parents to believe they can regain custody of the child by complying with a permanency plan's requirements, it is fundamentally unfair for DCS to rely on pre-removal abuse, rather than the parents' compliance in the intervening years, as a basis to terminate parental rights.

[17]This date differs from that used by DCS at trial and on appeal. The trial court also recited other details from the order, indicating the trial court reviewed the actual order. In the absence of the order in the record before us, we must presume the trial court's findings are supported by the evidence.

(1) the commissioner of children's services, if the person has been found to have committed severe child abuse, or, if there has been no such finding, by the commissioner's designee having a master's degree in social work or equivalent training and experience; and either, as the commissioner deems appropriate;

(2) a psychiatrist or, in the alternative, a physician and a psychologist, based on professionally appropriate examinations of the child and of the person who engaged in or failed to protect the child from the brutality or abuse; or

(3) A multi-disciplinary protective services team of the department of children's services based on professionally appropriate examinations of the child and of the person who engaged in or failed to protect the child from the brutality or abuse.

Tenn. Code Ann. § 37-1-130(c).

The Commissioner's designee, Mr. Brogden, testified regarding his review of the case herein as well as generally regarding sex abuse cases, treatments, and resolutions. It is not clear from his testimony whether this case was subjected to the review because of the statute or because of internal departmental policy.

DCS, however, appears to take the position that the review was required by the statute. In addition to the statement in the termination petition, DCS's brief filed with this court states that "when, **as in this case**, a child is found dependent and neglected as a result of child abuse," the statutes required a commissioner review and recommendation. It further states that there was a review conducted by the commissioner's designee, "as required by the above statutes [Tenn. Code Ann. § 37-1-130(c)]."

Because it is now undisputed that there was no judicial finding of child abuse, Tenn. Code Ann. § 37-1-130(c) did not apply to this case.[18] DCS was, of course, free to use whatever process it considered appropriate in deciding what direction to take with regard to these children, and the trial court herein heard about the review, the conclusion that the children should not be returned home, and the recommendation that termination of parental rights be initiated.

There was some question at trial as to the completeness of the information submitted to the Commissioner or designee for the review. After hearing the testimony and reviewing the submittals, the trial court found:

The Court also finds that there was inadequate information presented for the commissioner's review. The Court finds that the witness Maria Dittmar conceded that she was aware that counseling with Mr. Kerstetter was ongoing at the time she submitted the commissioner's review. The Court finds that the commissioner only

---

[18]DCS conceded this point at oral argument.

made a statement that "there was an entry that the [Parents] saw a Dr. Kerstetter in 6-99, but there is no report from him." At the time the commissioner's review was submitted on August 21, 2000, the respondents would have been seeing Dr. Kerstetter for a year and two months. The Court therefore finds that the omission of Dr. Kerstetter's records from the commissioner's review was material and was a deliberate omission on the part of DCS.[19] The Court finds as a matter of fact that any statements by DCS to the effect that there was no anger management counseling and no sex abuse counseling at the time of the commissioner's review are incorrect statements as a matter of fact.

Even if the statute triggering a Commissioner's review applied in this case, a trial court is not required to follow the recommendation emanating from that review, but is only required to consider it. The trial court herein thoroughly considered the review process and the resulting conclusion and recommendation and found it lacking because of incomplete information.

One additional issue relating to a finding of severe child abuse must be discussed. DCS argues that the trial court did not make the specific finding required by Tenn. Code Ann. § 37-1-130(d) before a child "who has been found to be a victim of severe child abuse" can be returned home. As DCS conceded at oral argument, that statute does not apply herein because there was no judicial finding of abuse.

### III. ABANDONMENT

The first ground relied upon by DCS for the termination of parental rights was abandonment of the children.[20] In a termination proceeding abandonment occurs when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i).

When failure to support or failure to visit is relied upon to show abandonment, there must be an element of intent or willfulness in that failure. *In re Swanson*, 2 S.W.3d at 187. In that case, the Tennessee Supreme Court struck down as unconstitutional those portions of the statutory

---

[19]The trial court also found this omission reprehensible.

[20]Tenn. Code Ann. § 36-1-113(g)(1) lists abandonment as defined in Tenn. Code Ann. § 37-1-102 as a ground for termination.

definition of abandonment that created an irrebuttable presumption of abandonment from failure to support for four months regardless of the intent or purposefulness of the parent, because those statutory definitions "simply do not allow for the type of individualized decision-making which must take place when a fundamental constitutional right is at stake." *Id.* at 188. Consequently, the Court held that "Until otherwise amended by our legislature, the definition [of abandonment] that was in effect under prior law shall be applied." *Id.* at 189.

As explained in *Swanson*, that prior law included an element of intent in both failure to visit and failure to support. Essentially, abandonment was interpreted to require "conduct on the part of the parent which evinces a settled purpose to forego all parental claims to the child." *Swanson,* 2 S.W.3d at 184 (quoting *Ex parte Wolfenden*, 49 Tenn. App. 1, 5, 349 S.W.2d 713, 714 (1959)). A number of factors are to be considered in determining whether a parent has abandoned his or her child. *O'Daniel*, 905 S.W.2d at 187; *Koivu v. Irwin*, 721 S.W.2d 803, 807 (Tenn. Ct. App. 1986). The ultimate question is whether there is clear and convincing evidence of an overall lack of any parental responsibility. *Koivu*, 721 S.W.2d at 807.

Herein, the trial court made the following findings of fact with respect to the parents' efforts at visitation:

> . . . . the Court finds that the respondents attended the vast majority of visits that were set up by DCS, and that DCS canceled several visits, and the number of visits DCS canceled were more than the number of visits the respondents missed. The Court therefore finds as a matter of fact that the visitation with the minor children was not "token visitation." In reaching this conclusion, the Court relies not only upon the testimony of the respondents, but upon the witnesses John Rogers, Sherry Lynn Long, and Deborah Stafford, all of whom are relatives of the respondents, and all of whom testified to the recent contact the respondents had with the minor children during visitations.
>
> ****
>
> The Court also finds that [Father and Mother] attempted to the best of their ability and limitations to observe visitation, and that their timeliness under difficult circumstances in making their appointments was better than the timeliness of DCS, which canceled several visitations.

The evidence does not preponderate against these factual findings. The parents made good faith efforts to see their children as often as possible and to remember their birthdays and special occasions with presents. They often brought small gifts to the visits. The guardian *ad litem* noted in his report that "[i]t is obvious in speaking with the children that the [parents]] had visited with the children many times in the DCS office in Tracy City." Even DCS witnesses testified that the parents had been consistent in their visitation.

With respect to the parents' admitted failure to make child support payments, the trial court made the following finding of fact:

The Court finds that the respondents made one payment of $10.00 in child support and apparently no more. The record is contentious and convoluted as to this issue, but the Court finds that in addition to the mental problems of the respondents, there have been numerous attorneys involved in this matter, and the Court does not find as a matter of fact that the consequences of not paying the $10.00 per week, an absolute minimal amount at best, were clearly explained to the respondents. The Court further finds that DCS took no further action against the respondents on the non-payment issue.

The evidence does not preponderate against this finding. In addition, there was evidence regarding the financial situation of the parents which calls into question their ability to pay. Based upon its factual findings, the trial court concluded:

The Court concludes that failure to pay a token amount of child support under circumstances that may not have been clearly explained to the respondents is not grounds for their termination; the Court does not envision that the laws of the State of Tennessee permit the termination of the parental rights of poor persons simply based on their poverty.

Relying upon *Swanson*, the court found that DCS had not met the burden of showing "a settled purpose to forego all parental duties and to relinquish all parental claims to the child." We agree with the trial court that DCS failed to provide clear and convincing proof that the parents had abandoned their children by willful failure to support or visit.

In addition, DCS also asserts that abandonment was proved under another provision of the statute, to-wit:

The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and that for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the

-11-

child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

DCS asserts this section applies and that because the parents "had failed to deal with the issue that prevented them from regaining custody" in the four months after removal as well as in the four and half years between the removal of the children and the trial, they had abandoned the children. By this statement, DCS refers to the parents' steadfast denial of abuse.

The children were removed from the home February 12, 1997. DCS met with the parents and agreed to the first permanency plan on April 7, 1997. That plan listed as the first desired outcome a determination (by DCS) of whether the alleged sexual abuse had occurred. To accomplish this, the parents were to agree to a questionaire/polygraph examination, agree to psychological and psychosexual assessments, and to follow up with any recommended counseling. The target date for accomplishment of these steps was set at June 30, 1997, and DCS was responsible for setting up the referrals.

Thus, the records of DCS refute the claim that the parents made no reasonable efforts or demonstrated a lack of concern in the four months immediately following removal. Nothing in the record indicates the parents did not cooperate with DCS during those months, as evidenced by their participation in permanency planning. At the time of the first plan, DCS had no expectation that DCS itself or the parents would complete the plan's requirements in the first four months; the plan was not signed for two months.

To the extent the four months requirement in the statute can be read to apply to any four month period, as opposed to the four months immediately following removal, the record shows that DCS continued to set goals with longer deadlines and continued to review the plans, and also that the parents acted under the assumption the plans set the requirements for them to get their children back. This part of DCS's abandonment argument is simply a recasting of its arguments in support of the other grounds alleged, *i.e.*, that the parents did not substantially comply with the requirements of the permanency plans and, as a result, conditions persisted that would prevent a safe return of the children to the home.

### IV. SUBSTANTIAL NONCOMPLIANCE AND PERSISTENCE OF CONDITIONS

### A. THE LAW

Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights when there has been substantial noncompliance by the parent with the statement of responsibilities in a permanency plan or a plan of care prepared pursuant to the provisions of title 37, chapter 2, part 4.

The appropriate analysis for reviewing termination decisions based on Tenn. Code Ann. § 36-1-113(g)(2) has been discussed by the Tennessee Supreme Court in *In re Valentine*, 79 S.W.3d 539 (Tenn. 2002). Prior to, and in conjunction with, terminating a parent's rights on this ground, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and are related to remedying the conditions which necessitate foster care placement." *Id.* at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). If the trial court fails to make this finding, this court must review the trial court's decision *de novo* without a presumption of correctness. *In re Valentine*, 79 S.W.3d at 547. The trial court herein made specific findings of fact regarding the parents' compliance with various requirements of the plans. Those findings are reviewed with a presumption of correctness. Determining whether substantial noncompliance exists is a question of law that must also be reviewed without a presumption of correctness. *Id.* at 548.

In order for noncompliance to justify the termination of parental rights, the requirement must be specific and the noncompliance must be "substantial." In other words, mere technical noncompliance alone is not sufficient to justify the termination of parental rights. *Id.* at 548. Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *In re Valentine*, 79 S.W.3d at 548-49. Additionally, the parent's degree of noncompliance with a reasonable and related requirement must be assessed.

The persistence of conditions ground is set out in Tenn. Code Ann. § 36-1-113(g)(3)(A), and allows a trial court to terminate the parental rights if:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Again, the trial court made specific findings of fact regarding these issues.

## B. THE FACTS

A permanency plan, previously called a plan of care, is a written plan for a child placed in foster care. The plan sets out requirements to achieve the stated permanency goal, which can be family reunification, adoption or permanent foster care. Tenn. Code Ann. § 37-2-402(8) & 403(a)(1). The requirements must be stated in specific terms and must be reasonably related to the specified goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). The parents herein entered into the first permanency plan with DCS on April 7, 1997. Over the course of DCS's involvement with this family, a number of other plans were prepared, roughly at yearly intervals.[21]

The record before us is somewhat problematic with regard to the plans. The trial court found that four such plans were entered into, but our record includes only three of those. DCS's brief refers only to the first two. The April 7, 1997 plan and the August 27, 1998 plan appear in our record and are signed by the parents. The only 1997 plans in the record are those for M.A. and S.S.; there is no plan for R.S. There is a complete set of 1998 plans, in that there is a separate plan for each child, although many of the entries are the same for each child's plan, and each plan makes some generalized statements with regard to "the children."

There is a copy of a plan dated September 9, 1999, but the parents did not sign this plan indicating their agreement. It includes a notation that the parents "did not attend" the staffing. That plan is accompanied by a February 21, 2001, order of the Juvenile Court of Franklin County approving the plan and stating that the hearing on the plan was held February 15, 2001. The order includes only the youngest child in the style of the matter, and the plan itself lists only that child as the subject. However, the plan discusses addressing behavior problems of all the children, the appropriate placement for each of the three children, and the foster parents' responsibility to monitor the "children" during and after visitation. It also lists the schools attended by each child and his or her grade level.

Our record also includes a motion filed May 17, 2001, in the Juvenile Court by Mother and Father objecting to a permanency plan filed by DCS and ratified by that court on the basis that the plan was filed after DCS had filed the petition to terminate parental rights in the Circuit Court. The motion does not identify the precise plan objected to, but it would have been filed with the juvenile court after September 6, 2000. Of course, knowing the date the plan was filed for court approval does not necessarily narrow down the date the plan was prepared or staffed,[22] and we are unaware of whether the plan was agreed to by the parents.

---

[21] A child's placement in foster care must be reviewed annually, and permanency plans are to be reviewed no less than every six (6) months thereafter, to assess compliance with the requirements and project a likely date on which the goal of the plan will be achieved. Tenn. Code Ann. § 37-2-404(b).

[22] Based upon the only order we have wherein the juvenile court approved a permanency plan, a significant amount of time could have passed.

Each of the plans introduced at trial listed return to parents, or reunification of the family, as the permanency goal. The record also includes some reports of foster care or permanency reviews by the foster care review board. From them we can conclude that the goal remained reunification of the family until the board review on November 17, 2000,[23] after the results of the Commissioner's review were known.

Under the initial plan, the parents agreed to pay $10 per week in child support. The parents also agreed to: (1) submit to a questionnaire/polygraph exam "to further investigate the allegations of sexual abuse," (2) submit to psychological/psychosexual assessment, also with the goal of determining "if the sexual abuse occurred and if [Mother] did fail to protect [R. S.]," and (3) attend counseling to address sexual abuse issues and safety issues for the children. With regard to the counseling, the plan stated the parents "will take responsibility for the abuse, understand what effects this has on the family and children and show remorse." In addition, Father was to get counseling to address anger issues, and the parents were to be provided Homemaker services, attend parenting classes, and attend supervised visits with the children.

The first plan was written by the CPS worker who did the initial interviews. She did not make any arrangements for the services required in the plan because that was not her responsibility. Between the first plan and the second, the parents attended and completed parenting classes. Father underwent a clinical assessment performed by Alden Klein, Ph.D., Ed.S., M.A.[24] The assessment was inconclusive as to Father's propensity for child molestation. Dr. Klein recommended that Father be seen in a psychiatric outpatient setting, apparently for potential mental health issues unrelated to sexual abuse, and to take any medication recommended. The assessment stated that Father denied the allegations of abuse. It also stated that the children needed to be reunited with the parents, under close supervision and monitoring, and that the entire family needed to be involved in family counseling.

The parents also began the counseling required by the original plan with a counselor arranged by DHS. After a few sessions, that counselor determined that further sessions would not be useful unless Father and Mother admitted that the abuse happened.[25]

---

[23]At least one earlier report listed both adoption and return to home as goals. The case summary of the Commissioner's review inaccurately stated that the Foster Care Review Board had recommended adoption during reviews with one exception in 1999.

[24]Although the assessment stated the evaluation was performed in January of 1997, it is clear that date is incorrect since the report also states that Father's children had been in foster care for a year.

[25]Father testified that this counselor told him that if he was not going to admit he molested R.S., then there was no purpose in continuing the counseling. DCS introduced a report from the same counselor regarding Mother and reflecting progress in the period of July 1997 through October 1997. The counselor stated that Mother has consistently maintained that Father did not sexually abuse R.S. and recommended that counseling continue when Mother was "open to dealing with problems." One of the DCS case managers testified that the original counselor refused to see the parents again because of their denial.

A second plan was developed sixteen months after the first. It was prepared by Erica Crawford, the case manager who first became involved with the family the month before. The goal of the second plan remained return to parents, and the plan included essentially the same responsibilities as the first, except it required the parents to also participate in family counseling if recommended by the children's counselors, cooperate with CPS investigators, and keep DCS informed of any changes in their lives. The second plan recognized that Dr. Klein had done an assessment of Father since the first plan and included requirements recommended by Dr. Klein, which included that Father see a psychiatrist and follow through with any recommendations made, and that the parents become more independent of Mother's family.

Even though Father had been evaluated, the second plan included a requirement that the parents submit to a psychosexual assessment. Ms. Crawford testified that the purpose of that requirement was "either to rule out if [Father] could have been a perpetrator, if he has the tendencies." She also testified that Father did get a second assessment after the second plan was agreed to, and that both assessments were inconclusive. The former case manager also testified that the recommendation for family counseling was contingent upon agreement by the children's counselor, and that was not given, so the reason for the absence of family counseling could not be attributed to the parents.

Ms. Crawford testified that the parents had missed only two visits with the children during the over one year period she was their case manager and that the parents had cooperated with DCS. The former case manager testified the parents may have attended counseling before she became the case manager. She stated that one of the requirements for counseling was that the parents admit there had been abuse. When asked what requirements of the plan the parents had not met, she stated they had not done as much counseling as they were supposed to. She also testified that she set up the original meeting for counseling with Mr. Kerstetter and that the parents were responsible to attend after that. The parents' first session with Mr. Kerstetter was in June of 1999, and Ms. Crawford stopped being their case manager in July of that year. Ms. Crawford was unaware of the parents' continuing counseling sessions, but testified that if they were still seeing Mr. Kerstetter regularly, they would be in compliance with the counseling requirement.

This second plan, prepared by Ms. Crawford and dated August 1998, repeated the earlier plan's statement that the parents were to submit to a polygraph exam to aid in the investigation of the alleged abuse and to determine if Father was capable of the abuse. The original requirement that Mother also take a polygraph exam was waived. Ms. Crawford testified that she was aware that Father took two polygraphs.[26] She stated that she had been instructed by her supervisor to require the second test.[27] She set up the second test, and its results were introduced. The examiner found Father had given truthful answers denying sexual abuse of any of the children.

---

[26]There was some discussion of whether Father had been required to take two or three tests. The trial court stated it wanted to know from DCS how many tests it had made Father take.

[27]She later stated that the oldest child had revealed to his counselor prior sexual abuse by Father before the second permanency plan, and DCS decided to add the new polygraph because of the new allegations.

On the September 1999 plan for S. S., which parents did not sign but which was much later approved by the juvenile court, the only services listed as needed were individual and family counseling, and the required change was stated as dealing with, coming to terms with, and overcoming issues of sexual abuse as well as other emotional abuse. No other requirements are listed for parents, and the goal of the plan remained a return to the parents.[28]

Another DCS employee, Maria Dittmar, testified she had been the family's case manager from December 29, 1999 until March of 2001; she was the petitioner in the case. She did not prepare a permanency plan for the children, but operated off the old plan, which she first stated was the 1998 plan, but then identified it as the September 1999 plan that had been prepared by her immediate predecessor. She inaccurately testified that the 1999 plan changed the permanency goal to adoption.[29] She also inaccurately stated the 1999 plan had essentially the same requirements for the parents as the previous plan.[30]

Ms. Dittmar testified that the parents told her they were going to counseling with Mr. Kerstetter. She prepared the case summary for the commissioner's review in May of 2000, but did not include complete information about the extent or type of counseling the parents were undergoing; she reported the parents had not completed counseling.[31]

Ms. Dittmar testified that the reason she filed the petition was because the parents did not attend or complete counseling and continued to deny the abuse. The decision to pursue termination of parental rights also resulted from the recommendation of the commissioner's designee review, which was completed in August of 2000, and which was based on incomplete information regarding the parents' counseling efforts. Ms. Dittmar alleged in the petition for termination that the parents had not attended or completed any counseling about sexual abuse issues, although the parents told her they were in counseling, because they never provided a report or proof to her. According to the counselor, DCS never asked him for a report and never called to verify the parents' visits, even though DCS made the initial referral to him.

---

[28] This plan states that the reason the children came into custody was that Father allegedly sexually abused them. Of course, this is incorrect since all prior records and the testimony make it clear that the reason the children were initially removed from the home was an allegation of abuse of one child, R. S.

[29] On the plan that was introduced, the goal of "Return to Parent" is checked. After the direction, "If goal has changed since last plan revision, provide justification for change," the preparer, another former case manager, had stated "Not applicable."

[30] The 1999 plan assigns only one requirement or responsibility to the parents, as described earlier.

[31] She testified a report from the counselor was not included because DCS never signed a release for the report and because when she asked the parents about the counseling, they directed her to Father's attorney. The witness stated she had a copy of what she sent to the commissioner, but not with her. The trial court later requested a copy of all information sent to the commissioner for the review.

-17-

Mr. Kerstetter testified by deposition and stated that at the beginning of his counseling with the parents, "We identified three primary issues, anger and how to handle anger; issues regarding sexuality and the nature of sexual abuse and protecting people from that, especially children; and parenting and efficient boundary setting." When confronted with these statements, Ms. Dittmar conceded that these areas met DCS's requirements for counseling.

Mr. Kerstetter testified that he first started seeing the parents in June of 1999. Originally, they had weekly sessions, and later decreased the frequency to twice monthly and then monthly. There had been 38 sessions, 6 with Mother individually, 6 with Father individually, and 26 jointly. The parents related to him the issues they needed to work on, as described earlier, and at some point he reviewed a permanency plan the parents showed him. After his initial meeting with the parents, he contacted the DCS case manager, Ms. Crawford, who faxed him an unsigned document called a court report describing the circumstances, from DCS's viewpoint, under which the children came into and remained in state custody.

Mr. Kerstetter testified that the parents seldom missed a session, were very cooperative, made great efforts, and progressed well in counseling. They developed reasoning skills necessary to anger management and good parenting. They learned various methods to deal with those issues. They also came to an understanding of sexual abuse, its effects, and how to protect children from it. He testified that both Mother and Father adamantly and consistently denied that Father had molested any of the children. Mr. Kerstetter recognized that any return of the children to the home would require close monitoring and continued counseling for the entire family. He also testified that if the children were to be returned, or if the parents were allowed more time with their children, he would begin more frequent sessions with the parents prior to those occurrences.

As the trial court found, Mr. Kerstetter's testimony was very positive toward the parents and their efforts. He found their relationship strong and their commitment to and love for their children also strong. They were worried about their children and the care they were receiving and wanted to do what was necessary to get the children back home. The trial court accurately characterized Mr. Kerstetter's testimony as "extremely positive on behalf of [the parents], and he essentially stated that they had made every effort to do what was necessary to get the children back home."

## C. ANALYSIS

DCS had the burden of proving the existence of a ground for termination by clear and convincing evidence. Proof of the ground of substantial noncompliance with the requirements of a permanency plan must begin with proof of those requirements. The trial court found there had been four plans prepared; DCS did not introduce a fourth and most current plan.[32] It did introduce a September 1999 plan, and this is the plan Ms. Dittmar said she worked from in dealing with the family and in deciding to send the case for commissioner's review and to file a termination petition.

---

[32]Thus, technically, DCS could not prove a failure to comply with the most current plan since it did not prove that plan.

-18-

The parents' primary requirement under that plan was to attend counseling to deal with issues of sexual abuse.[33] As a barrier to permanency, the plan stated, "To address the behavior problems of all the children especially R.S. that surround the sexual abuse and continue with counseling. To also address family counseling when appropriate with parents at the recommendation of DCS." Under services needed, the plan states, "Individual and Family counseling needs to be set up and monitored for attendance." The required change was stated to be, "To overcome the issues of sexual abuse as well as other emotional abuse" and "To deal with and come to terms with the sexual abuse." The parties responsible included DCS and the parents.

It is clear from Ms. Dittmar's testimony that the reason she pursued commissioner review and then termination as recommended by that review was her belief that the parents had not complied with the counseling requirement. Although they told her they were in counseling with Mr. Kerstetter, to whom DCS referred them, and referred her to their attorney for further questions, Ms. Dittmar stated she had no proof of their compliance. Obviously, Mr. Kerstetter's testimony establishes proof of compliance with the counseling requirement.

At trial, and in its brief on appeal, DCS relied upon the earlier plans, those prepared in 1997 and 1998. Even if we can consider the requirements of those plans that were not adopted into the 1999 plan as in effect, the proof shows that the parents substantially complied with those requirements.[34] DCS did not prove otherwise by clear and convincing evidence. The trial court found that the parents had substantially complied or attempted to comply with every aspect of the permanency plans. The court specifically found that the parents substantially complied with polygraph tests, psychosexual testing, counseling and visitation, and noted that, "[s]everal of the items that DCS claims were not properly done have in fact been done." Our review of the record confirms the trial court's determination that DCS did not prove the ground of substantial noncompliance by clear and convincing evidence.

It is clear from the testimony of various witnesses, the arguments of DCS at trial and on appeal, and from documents in the record, that DCS's concern is that the parents have consistently denied the sexual abuse. DCS's position is, essentially, that unless these parents admit that abuse occurred, the return of the children to the parents' home will not be safe.

As the guardian *ad litem* correctly observed, "**it was admitted by witnesses of DCS that the [parents] had done just about everything asked except 'admit guilt' to the sexual allegations.**" During cross-examination, DCS's expert witness and commissioner's designee, John Brodgen, was asked

---

[33]The plan also required the parents to follow DCS recommendations about how to conduct themselves at visitation. Although there was testimony from DCS workers about the visitations, most of that testimony predates this plan. In any event, in view of the testimony of other family members who attended visits, and Mr. Kerstetter's testimony regarding the unusual nature of a situation of only twice weekly visits, DCS failed to prove that the parents did not substantially comply with this requirement of the 1999 plan.

[34]Some of the requirements were waived, such as Mother taking a polygraph exam, and DCS employees testified that some, such a homemaker services, were probably not necessary.

how often DCS had returned children to homes when sexual abuse was alleged and answered, "First of all, it's not going to happen. The Department- -well, the Court can rule however they want; but our position will be sex offender treatment must be completed first." He also testified that effective treatment requires an admission of abuse. Mr. Brodgen commented further that parents confronted with allegations of sexual abuse would be better served by "do[ing] whatever they're supposed to do without whining and griping and lying and conniving, you know, and hiring an attorney every time you say something they don't like or whatever."

Similarly, Ms. Dittmar admitted that the parents had to admit to the sexual abuse before DCS would consider returning the children to the home. DCS's records also indicate this impediment existed. The second plan listed as a barrier to reunification the fact that both parents denied any abuse. The plan required counseling with the desired outcome again stated to be that the parents take responsibility for the abuse and show remorse. The various reports to or by the foster care review board also indicate the parents' denial of abuse was a problem or barrier to returning the children.

For example, the January 13, 1999 report states, "[The parents] continue to deny the sexual abuse and this is a definite barrier to permanency. [They] have not been able to attend counseling because of their continued denial of the sexual abuse."[35] The periodic review summary of the same date, signed by the board chair listed as a barrier the parents' denial that abuse took place. It also noted that a new counselor for the parents needed to be secured and that the process should speed up.[36] Similarly, the summary dated August 6, 1999, stated as a barrier to achieving reunification of the family the parents' denial of abuse.

The review summary dated March 10, 2000, signed by the board chair, stated that parents had completed most of the tasks assigned them in the permanency plans, "with the exception of admitting sexual abuse occurred." It noted the parents' progress toward reducing risks necessitating continued foster care was minimal, because they "will not admit to sexual abuse." The barrier to returning the children home was listed as "parents unwillingness to admit sexual abuse occurred." The recommendation from that review was to wait on the results of the commissioner's review.

Thus, although admitting the abuse was never made a specific requirement or responsibility assigned to parents in a plan, it is clear that DCS and the review board considered the parents' continued denials a problem with regard to reuniting the family. The trial court found:

> The law does not require someone who has not committed an offense to state that he
> or she has committed an offense in order to get the children back. It appears both
> from the proposed permanency plans and the testimony of DCS worker Maria

---

[35]Of course, the record shows that the parents began such counseling with a new counselor in June of 1999.

[36]Interestingly, the board summary states that return to parents was not currently an appropriate goal, "although additional evidence which may be gathered may make the goal of return to home appropriate in the future."

Dittmar that there is obviously going to be no return of the children until the respondents admit their guilt.

We agree with the trial court's statements. In addition, we note that none of the plans ever explicitly required the parents to admit that abuse had occurred. Thus, the denials maintained over four and a half years cannot constitute a failure to substantially comply with a permanency plan requirement.

DCS's position on appeal is that because Mother and Father have denied the allegations of sexual abuse, that issue has not been adequately addressed by them so as to protect the children from future abuse. Thus, rather than claiming that admissions of the abuse are required by the permanency plans, DCS actually argues that such admission is a prerequisite to effective counseling and remediation. Mr. Kerstetter's testimony refuted this contention. In any event, we view DCS's position as really an argument in support of the ground that conditions persist that "in all reasonable probability would cause the child[ren] to be subjected to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(A)(i).

Although its position on appeal was broadened, it is clear to us, as it was to the trial court, that DCS at least originally believed Father committed sexual abuse. In this regard, the trial court's failure to find that DCS had proved that allegation by clear and convincing evidence is relevant.[37] The original petition for termination had not listed either a prior judicial finding of severe abuse, or severe abuse itself, as a ground for termination. Since DCS took the position throughout the trial that a prior judicial finding of severe abuse had been made, DCS did not ask the trial court herein to determine that there had been severe or sexual abuse.

However, in its brief, asserting that the issue of the allegations of abuse was tried by consent, DCS argues that the trial court erred when it ruled that DCS did not prove by clear and convincing evidence that the parents had committed severe abuse against their children. The brief elsewhere states, "While the court did not make a specific finding as to the severe abuse, it is clear that the court did not believe it had happened . . . ." We agree that the trial court made no specific finding that the parents had not committed severe abuse, but believe that the order can be fairly interpreted as finding that DCS did not provide clear and convincing evidence of abuse.

The alleged abuse was the cornerstone for most of DCS's arguments regarding the grounds actually plead. On this issue, the trial court found that, "**At or near the time of the alleged abuse, the children were examined by the family medical doctor, Dr. Craig Horton. It is stipulated that Dr. Horton found no medical evidence of sexual abuse.**" The court made other specific findings of fact, set out below, and the evidence does not preponderate against the specific factual findings made by the court.

_____

[37]The trial court also saw the connection and observed, "It's a 'Catch 22' situation, where if the sexual abuse occurred and they don't admit it, then they don't do what they've said that they're required to do, and then we've got that issue. If they didn't do it [abuse], then they don't necessarily have to do these things [therapy or counseling]. So the dog's chasing it's tail here. This case is going to turn on whether I think there's evidence of sexual abuse. . . . "

In addition, there was evidence that, prior to the initial allegations herein, the children, or at least the older two, had viewed pornographic movies at an uncle's house without the knowledge of the parents. The evidence showed that the parents would not have allowed the children to be present when such materials were being viewed. The older son testified he did not tell his parents about the movies because he would get in trouble. The record also includes testimony regarding the effect of exposure to pornographic films, including increasing a child's sexual knowledge beyond that normal for his age and triggering sexual behavior. The initial allegations were made during unusual interviews and after lengthy detention. Mother has before and since denied the allegations. Father has remained steadfast in his denial. No criminal charges were brought against either parent.

Based upon its findings of fact, the trial court concluded:

Even in a proceeding that required proof by a mere preponderance of the evidence, this matter would be extremely debatable. There is no physical evidence of sexual abuse against any of the children. The middle child of the respondents who made the initial allegations that triggered this entire matter is questionable as to his credibility, and there were no allegations of sexual abuse against the oldest and younger child at the time of the initial referral.

The Court finds it interesting that sexual problems on the youngest child in the form of masturbation are not noted until a parenting plan in November of 1999 and not noted in an earlier plan in 1998, both periods of time being well over a year after the children had been removed from the home of their parents. The Court also finds it noteworthy that the allegations of sexual abuse by the oldest minor child took place approximately a year after the removal. Without speculating as to the reasons for these late-developing charges, the fact remains that [Father], the suspected perpetrator, underwent at least 2 and possibly 3 polygraph tests and apparently passed all of them, and that all psychosexual tests taken by him were non-conclusive. In addition, the parties making the original referral have changed their minds, and testified to these matters in open Court.

To the extent DCS now argues that it met its burden of proving the ground of severe child abuse, even though it took the position throughout the trial that it did not need to prove it because a judicial finding of abuse had already been made, after reviewing the entire record *de novo*, we agree with the trial court that DCS did not prove by clear and convincing evidence that Father abused any of the children.[38]

---

[38]The guardian *ad litem* found disturbing DCS's position that the parents must admit guilt, especially since the parents "have denied the sexual allegations from the outset, and further that there was no physical evidence of any abuse set out in any of the proof. Further, the allegations of sexual abuse came out after a significant period of time after the children were taken into custody and after approximately 20 interviews with the boys."

DCS makes an alternative argument that, "Even if [Father] was not the actual perpetrator of the abuse, both [Mother and Father] failed to protect their children from abuse as contemplated by Tenn. Code Ann. § 37-1-102(b)(21)(A)."[39] The parents' denial that their children were the victims of abuse by an unidentified person, according to DCS, places the children at risk. We note that DCS put on no proof regarding abuse by any suspected perpetrator other than Father or any evidence as to how the parents could have failed to protect the children in that unknown situation. The original allegations and DCS's approach to the case were focused on Father as the potential abuser.

DCS's concern appears to be the same regardless of who was the perpetrator of the alleged abuse: unless the parents admit that their children were the victims of sexual abuse by someone else, DCS fears counseling would be ineffective to prevent recurrence. Mr. Kerstetter testified that the parents had learned about prevention or protection of children from sexual abuse. While it is clear from the experts' testimony that family therapy and addressing the children's allegations would be a necessary prerequisite to a safe and successful reunification of the family, the parents have not had the opportunity to discuss the issue with the children. DCS has specifically instructed them not to discuss the case on visits. Similarly, the parents have not had the opportunity to participate in family counseling with the children, because the children's counselor would not agree to it.

We agree with the trial court that DCS failed to prove that the condition that led to removal or other conditions preventing the return of the children to the home persist. Because DCS failed to prove by clear and convincing evidence the existence of any one ground for termination, we affirm the trial court's denial of the petition.

Denial of termination of parental rights does not mean an automatic return of the children to the parents' custody and does not change the custody arrangement in place. *In re Valentine*, 79 S.W.3d at 550. We are confident the court can structure a gradual reintegration that includes supervision, monitoring, and the needed counseling so as to be assured of the children's safety before custody is changed. Or, if the facts so warrant it, another petition can be filed in the future.

**Indeed, the trial court herein,** having denied the petition to terminate parental rights, found that "immediate replacement of the children with the parents after over four years is not practical at

---

[39]Tenn. Code Ann. § 37-1-102(b)(21) defines "severe child abuse" as:

(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;
(B) Specific brutality, abuse or neglect towards a child which in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
(C) The commission of any act towards the child prohibited by §§ 39-13-502, 39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child.

the present time" and ordered that the counseling of the parents with Mr. Kerstetter continue, that a home study be completed within thirty days, that DCS maintain an open child protective services file on the children, and that DCS prepare a plan for return of the children that will minimize trauma to the children by providing a gradual return. In addition, the court ordered that the plan was to provide for return to the parents within 90 days of its judgment and stated it would review the case for progress.

## V. JURISDICTION OF CIRCUIT COURT TO MAKE CUSTODY RULING

DCS argues that following the denial of the termination petition, the trial court lacked jurisdiction to order the return of the children to their parents. Specifically, DCS argues that when a petition to terminate parental rights is granted, Tenn. Code Ann. § 36-1-113(m) confers broad dispositional authority, but when termination is not ordered, as in this case, the matter stands dismissed and the authority of the circuit court is at end.

The juvenile court has exclusive jurisdiction over dependency and neglect proceedings. Tenn. Code Ann. § 37-1-103(a)(1). The juvenile court herein determined that the children were dependent and neglected. That order was not appealed and has not been vacated or altered by the juvenile court. That order gave the juvenile court exclusive jurisdiction over the custody of the children until the children reach adulthood or the order is vacated. *Dep't of Human Servs. v. Gouvitsa*, 735 S.W.2d 452, 455-56 (Tenn. Ct. App. 1987). So long as the dependency and neglect proceeding, and the custody issues related thereto, were pending in the juvenile court, no other court had jurisdiction to determine custody of these children. *Id.*

The exclusive jurisdiction of juvenile court is superceded when a petition for termination of parental rights is filed in another court with concurrent jurisdiction to make that determination. Tenn. Code Ann. § 36-1-113(a) gives concurrent jurisdiction with the juvenile court to circuit and chancery courts to terminate parental rights. The statute also provides:

> (m) Upon termination of parental or guardian rights, the court may award guardianship or partial guardianship of the child to a licensed child-placing agency or the department in any separate proceeding of the child with the right to place the child for adoption with the right to consent to the child's adoption, or to any prospective adoptive parent(s) with the right to adopt the child, as the case may be, subject to the remaining rights, if any, of other parent(s) or guardian(s) of the child.

Tenn. Code Ann. § 36-1-113(m).

There is no provision giving the court authority if the termination is denied. We agree with DCS that after the conclusion of a termination action denying termination, the termination case stands dismissed. Consequently, the authority of the court hearing only the termination matter ends. The denial of the termination does not change custody of the children. *In re Valentine*, 79 S.W.3d

at 551. Where there is an unappealed order finding the children dependent and neglected and awarding custody, jurisdiction reverts to the juvenile court that entered that order.

We agree with DCS that any custody decisions rest with exclusively with the Franklin County Juvenile Court. Accordingly, we vacate the part of the trial court's order requiring a home study and directing DCS to prepare a plan for the return of the children. The matter of the children's custody is properly considered by the juvenile court, and the parents should seek relief there. Costs of this appeal are taxed to the Department of Children's Services.

_____
PATRICIA J. COTTRELL, JUDGE